**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Hon. Marianne O. Battani |
| IN RE: SPARK PLUGS IN RE: OXYGEN SENSORS | Case No. 2:15-cv-03001-MOB-MKM Case No. 2:15-cv-11774-MOB-MKM Case No. 2:16-cv-13506-MOB-MKM Case No. 2:15-cv-03101-MOB-MKM Case No. 2:15-cv-12918-MOB-MKM Case No. 2:15-cv-11831-MOB-MKM |
| THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS | |

**OPINION AND ORDER GRANTING DEFENDANTS DENSO'S
AND NGK'S MOTIONS TO DISMISS AND TO STAY**

**I.      INTRODUCTION**

This matter is before the Court on Motions to Dismiss by Defendants DENSO

Corporation, DENSO International America, Inc., and DENSO Products and Services

Americas, Inc. (collectively, "DENSO") (Case No. 15-03101, Doc. 43; Case No. 16-

13506, Doc. 7; and Case No. 15-11831, Doc. 38) and by Defendants NGK Spark Plug

Co., Ltd., NGK Spark Plugs (U.S.A.), Inc., NGK Spark Plugs (U.S.A.) Holding, Inc., and

NTK Technologies, Inc. (collectively, "NGK") (Case Nos. 15-03101, Doc. 44; Case No.

15-03001, Doc. 34; Case No. 15-11774, Doc. 36; and Case No. 15-12918, Doc. 35 ).

DENSO and NGK both seek either to dismiss or to stay, pending arbitration, the Direct

Purchaser Plaintiffs' ("DPPs") actions relating to Spark Plugs and Oxygen Sensors on

the ground that these matters are subject to arbitration pursuant to the doctrine of

1

equitable estoppel.   For the following reasons, the Court **GRANTS** DENSO's motion –the claims brought against DENSO based on purchases made from Bosch are hereby **DISMISSED**, and the claims brought against DENSO based on purchases made from NGK are hereby **STAYED**.  The Court also **GRANTS** NGK's motion – the claims brought against NGK based on purchases made from Bosch or DENSO are hereby **DISMISSED**, and the claims brought against NGK based on purchases made directly from NGK are hereby **STAYED**.

## II.   STATEMENT OF FACTS

On May 18, 2015, certain of the DPPs filed class action complaints against NGK, DENSO, and Robert Bosch GmbH and Robert Bosch LLC (collectively, "Bosch"), alleging antitrust violations relating to the sale of Spark Plugs.  (Case No. 15-11774, Doc. 1).  On May 20, 2015, certain of the DPPs separately filed class action complaints – which were consolidated and merged on October 1, 2015 – against NGK, DENSO, and Bosch, alleging antitrust violations relating to the sale of Oxygen Sensors.  (Case No. 15-03101, Doc. 11).

All of Bosch's sales invoices executed with DPPs contain an acknowledgement that the purchase order is subject to the terms and conditions of sale.  (See Case No. 15-03101, Doc. 43, Ex. 2).  The terms and conditions contain an agreement to arbitrate "all disputes between the parties arising out of or related to this Agreement," and designate Michigan law as controlling. (Id. at Ex. 1).  Likewise, DENSO's distributor agreements executed with DPPs contain agreements to arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement," and designate California law as

2

controlling.  (Id. at Exs. 3-6).  However, it is undisputed that purchase orders executed with NGK did not contain an arbitration agreement.

In February 2016, DENSO and Bosch informed DPPs of their intention to file motions to dismiss on the ground that the claims were subject to mandatory arbitration. In April 2016, DPPs voluntarily dismissed without prejudice all claims against Bosch in both the Spark Plugs and the Oxygen Sensors cases.  DPPs also amended their complaints, presumably in an effort to withdraw claims that would have been subject to arbitration.  DPPs now have filed separate complaints against DENSO and NGK in both the Spark Plugs and Oxygen Sensor cases. The substantive allegations are the same as those set forth in the original complaints, as DPPs continue to allege injury based on the artificially inflated prices paid for Spark Plugs and Oxygen Sensors as a result of DENSO's, NGK's, and Bosch's alleged conspiracy to fix prices.  DPPs bring suit against NGK premised both on its direct liability arising from its own sales of Spark Plugs and Oxygen Sensors and on its joint and several liability for sales made by Bosch and DENSO.  In contrast, DPPs bring suit against DENSO based on its joint and several liability for purchases of Spark Plugs and Oxygen Sensors from Bosch and NGK, *but not* for damages arising from purchases made directly from DENSO.

III.    STANDARD OF REVIEW

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate a dispute arising from a commercial transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA reflects a strong federal policy in favor of arbitration agreements.

See Javich v. First Union Sec., Inc., 315 F.3d 619, 624 (6th Cir. 2004).  Accordingly, the

Sixth Circuit has instructed:

> When faced with a broad arbitration clause, such as one covering *any*
> dispute arising out of an agreement, a court should follow the presumption
> of arbitration and resolve doubts in favor of arbitration . . . . [I]n such a
> case, only an express provision excluding a specific dispute, or the most
> forceful evidence of a purpose to exclude the claim from arbitration, will
> remove the dispute from consideration by the arbitrators.

NCR Corp. v. Korala Assocs., Ltd., 512 F.3d 807, 813 (6th Cir. 2008) (emphasis in

original) (quoting Solvay Pharms. v. Duramed Pharms., 442 F.3d 471, 482 n.10 (6th Cir.

2006)).  Ultimately, however, courts are to temper this presumption favoring arbitration

with the understanding that the FAA "is at bottom a policy guaranteeing the enforcement

of private contractual arrangements."  Mitsubishi Motors Corp. v. Soler Chrysler-

Plymouth, Inc., 473 U.S. 614, 625 (1985).  Accordingly, "arbitration is a matter of

contract and a party cannot be required to submit to arbitration any dispute which he

has not agreed so to submit."  AT&T Techs. v. Commc'ns Workers of Am., 475 U.S.

643, 648 (1986) (internal quotation and citations omitted).  The court's objective is thus

to ensure that the terms of the arbitration agreement are enforced in accordance with

the intent of the parties.  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947

(1995) (citations omitted).  As such, "[w]hile ambiguities in the language of the

agreement should be resolved in favor of arbitration, we do not override the clear intent

of the parties, or reach a result inconsistent with the plain text of the contract, simply

because the policy favoring arbitration is implicated."  EEOC v. Waffle House, Inc., 534

U.S. 279, 294 (2002).  In interpreting an agreement to arbitrate, the traditional principles

of state contract law apply.  Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 631 (2009).

4

In determining whether arbitration should be compelled, courts must first evaluate whether the parties agreed to arbitrate the dispute and the scope of that agreement.  Mitsubishi, 473 U.S. at 626; Javich, 315 F.3d at 624 (citing AT&T Techs., 475 U.S. at 649).  Second, if the Court finds that the parties did agree to arbitrate, it must evaluate whether a statute or other policy consideration weigh against arbitration.  Mitsubishi, 473 U.S. at 628; Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000).  Finally, if a court determines that arbitration is proper, the FAA provides for a mandatory stay of proceedings.  See 9 U.S.C. § 3.  Alternatively, the Sixth Circuit has determined that dismissal without prejudice pursuant to Rule 12(b)(6) is also appropriate where a plaintiff's claims are subject to arbitration.  See Local Union 369, Int'l Bhd. Of Elec. Workers, AFL-CIO v. ADT Sec. Serv., Inc., 393 F. App'x 290, 293 (6th Cir. 2010) ("The failure to exhaust contractual arbitration procedures generally results . . . in dismissal under Federal Rule of Civil Procedure 12(b)(6).").

IV.   DISCUSSION

A.  Claims Asserted Against DENSO

1.  Equitable Estoppel Jurisprudence

As described above, the DPPs' claims against DENSO in both the Spark Plugs and Oxygen Sensor cases are premised on DENSO's joint and several liability for the damages alleged to be attributable to purchases from Bosch and NGK.  DPPs do not bring suit against DENSO based on purchases made directly from DENSO itself.  Therefore, to the extent that DPPs seek to hold DENSO jointly and severally liable for purchases from Bosch, DENSO argues these claims must be arbitrated pursuant to the arbitration clause incorporated by reference into the Bosch sales invoices under the

doctrine of equitable estoppel.  Likewise, DENSO argues that DPPs' claims based on

purchases from NGK must also be dismissed – or at least stayed pending the outcome

of arbitration of the Bosch claims.  DENSO maintains that because the damages

claimed as a result of NGK's sales are tied up in the same alleged conspiracy, judicial

economy would be best served by referring all matters to arbitration.

 Generally, a nonparty to an agreement may not be bound by its terms.  AFSCME

Council 25 v. Wayne Cty., 811 N.W.2d 4, 11 (Mich. Ct. App. 2011).  However,

"nonsignatories of arbitration agreements can still be bound by an agreement pursuant

to ordinary contract-related legal principles, including incorporation by reference,

assumption, agency, veil-piercing/alter ego, and estoppel."  Id. at 12 (citing Thomson-

CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir., 1995)).  Whether a

nonsignatory to an agreement containing an arbitration clause may compel a signatory

to arbitrate pursuant to equitable estoppel is governed by state law.  Arthur Andersen,

556 U.S. at 631.  Because DENSO is attempting to enforce only the Bosch arbitration

agreement as a nonsignatory, Michigan contract law relating to equitable estoppel is

controlling.

 A review of equitable estoppel jurisprudence reveals a muddled mix of

approaches that have steadily expanded the application of the doctrine.  See generally

Christopher Driskill, *A Dangerous Doctrine: The Case Against Using Concerted-*

*Misconduct Estoppel to Compel Arbitration*, 10 Ala. L. Rev. 443 (2009).  Consequently,

courts have made frequent pleas requesting that the Supreme Court clarify and refine

the law concerning this issue.  Id. at 460-62.  One of the seminal cases applying

equitable estoppel to compel a nonsignatory of an arbitration agreement to nonetheless

6

arbitrate its claims was decided by the Eleventh Circuit in <u>MS Dealer Service Corp. v. Franklin</u>.  <u>See</u> 177 F.3d 942 (11th Cir. 1999).  That case concerned a Buyers Order containing an arbitration clause, executed between the buyer and the seller of a vehicle.  <u>Id.</u> at 944.  The Buyers Order also incorporated by reference a "Retail Installment Contract" containing a provision charging the buyer $990.00 for a service contract through MS Dealer.  <u>Id.</u>  The buyer brought suit against both the seller and MS Dealer alleging a conspiracy to defraud her.  <u>Id.</u> at 945.  MS Dealer sought to invoke equitable estoppel to compel arbitration of the claims brought against it pursuant to the Buyers Order.  <u>Id.</u> at 946.

The court explained that equitable estoppel allows a nonsignatory of an arbitration agreement to compel arbitration in two circumstances.  First,

> [E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory.  *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993)*.  When each of a signatory's claims against a nonsignatory "makes reference to" or "presumes the existence of" the written agreement, the signatory's claims "arise[] out of and relate[] directly to the [written] agreement," and arbitration is appropriate.  *Id. at 758*.

<u>Id.</u> at 947.  Second,

> "[A]pplication of equitable estoppel is warranted … when the signatory [to the contract containing the arbitration clause] raises allegations of … substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  *Boyd v. Homes of Legend, Inc., 981 F. Supp. 1423, 1433 (M.D. Ala. 1997)*.

<u>Id.</u>  The court determined that, though the buyer did not allege breach of contract, the claims made reference to and presumed the existence of the Retail Installment Contract and the Buyers Order.  <u>Id.</u> at 947-48.  Further, the buyer's claims against the seller and

MS Dealer were inherently inseparable, as she alleged the two defendants had conspired together. Id. at 948.

In the wake of MS Dealer, countless courts have grappled with the very question now presented before this Court – whether the two factors articulated in that case were meant to be joined by an "and" or an "or."  The Fifth Circuit in particular has made seemingly inconsistent rulings on the issue.  In Grigson v. Creative Artists Agency, the Fifth Circuit adopted the two-part test set forth in MS Dealer and implied that either prong would serve as an independent basis for invoking equitable estoppel.  210 F.3d 524, 527.  However, the court noted that "equitable estoppel is much more readily applicable when the case presents both independent bases advanced by the Eleventh Circuit," as did the case confronted in Grigson.  Id. at 527-28.  Finally, the court emphasized that the test was not a rigid one, as each case turns on its facts and is grounded in equity or fairness.  Id.  Two years later, the Fifth Circuit confronted the same question in Hill v. G E Power Systems, Inc.  This time, the court unequivocally held that allegations of interdependent and concerted misconduct, without a showing that the claims relied on the terms of the written agreement, were insufficient to invoke equitable estoppel.  Hill, 282 F.3d 343, 349 (5th Cir. 2002).  However, in 2006, the Fifth Circuit seemingly overturned its decision in Hill.  First, it joined the two-prongs of the MS Dealer test with an "or."  Brown v. Pacific Life Insurance Co., 462 F.3d 384, 398 (5th Cir. 2006).  Second, it held that the district court had not abused its discretion in deciding that allegations of concerted misconduct alone were sufficient to invoke equitable estoppel and compel arbitration.  Id. at 398-99.  Though the court cited to its decision in

Hill, it did not harmonize it with its decision in Brown, instead heavily emphasizing the "abuse of discretion" standard.  Id. at 399.

In the context of this confusion, the Eleventh Circuit clarified its position in 2002. In In re Humana Inc. Managed Care Litigation, a group of physicians brought a class action against several HMOs, alleging claims such as RICO and ERISA violations and breach of contract.  285 F.3d 971, 973 (11th Cir. 2002).  "[S]ome of the doctors had contracts with some of the HMOs; some of those contracts had arbitration clauses; and some of those arbitration clauses placed limitations on the sort of damages an arbitrator may award."  Id.  The court determined that although the plaintiffs had alleged interdependent, collusive behavior, thus satisfying the second prong of the MS Dealer test, the suit did not rely upon or presume the existence of an underlying contract; accordingly, the court determined that satisfaction of the second prong alone was insufficient to justify the application of equitable estoppel.  Id. at 976.  Specifically, the court held:

> A plaintiff's allegations of collusive behavior between the signatory and nonsignatory parties to the contract do not automatically compel a court to order arbitration of all of the plaintiff's claims against the nonsignatory defendant; rather, such allegations support an application of estoppel only when they "establish[] that [the] claims against [the nonsignatory are] intimately founded in and intertwined with the obligations imposed by the [contract containing the arbitration clause]."

Id. at 975 (quoting MS Dealer, 177 F.3d at 948).  The court differentiated its decision from its finding in MS Dealer that the claims of collusion were intertwined with the contract: "although the doctors in this case do claim fraudulent collusive behavior by the HMOs, they make no suggestion that the contracts containing arbitration clauses are

themselves the product of, or in any way related to, the HMO's conspiratorial behavior." Id. at 976.

As discussed above, state law controls the application of equitable estoppel.  The Bosch arbitration clause designates Michigan law as controlling.  (Case No. 16-13506, Doc. 7, Ex. 1).  Michigan law on the matter of equitable estoppel, however, appears to be equally as confused as the jurisprudence from the Fifth Circuit – and for good reason, as Michigan courts have relied on the Fifth Circuit.  In an unpublished opinion, the Michigan Court of Appeals confronted a case in which the City of Detroit brought suit against its investment advisor and fiduciary Smith Barney Shearson, Inc. ("Smith Barney"), individual Smith Barney employees, and investment fund GSC, among others.  City of Detroit Police & Fire Ret. Sys. v. GSC CDO Fund, Ltd., No. 289185, 2010 Mich. App. LEXIS 843, at *1 (Mich. Ct. App. May 11, 2010).  The claims stemmed from allegations that the Smith Barney employees had falsely and fraudulently represented the risks of the GSC investment.  Id. at *2.  The court concluded that an arbitration provision contained in the consulting agreement executed between the City and Smith Barney compelled arbitration not only with Smith Barney but also with the nonsignatory defendants.  Id. at *17.  First, by relying on the Fifth Circuit's decision in Brown, the Michigan Court of Appeals implied that satisfaction of either prong in the two-prong MS Dealer test would permit the application of equitable estoppel to compel arbitration.  See id. at *15.  However, the court found that the claims presented satisfied both prongs, as they were premised on allegations of concerted misconduct that was intertwined with the consulting agreement.  Id. at *18-19 (quoting MS Dealer, 177 F.3d at 948) ("The underlying basis of all plaintiffs' claims emanates from and goes back to its relationship

with Smith Barney . . . .  Thus, plaintiff's allegations are 'intimately founded in and intertwined with the obligations imposed by the [agreement containing the arbitration clause].'").

The Michigan Court of Appeals next confronted the issue of equitable estoppel in a case involving a suit brought by investors against their financial institution, Robert W. Baird and Company, Inc. ("Baird"), and life insurance provider, AXA.  Tobel v. AXA Equitable Life Ins. Co., No. 298129, 2012 Mich. App. LEXIS 326, at *1 (Mich. Ct. App. 2012).  The investors had entered into Cash Account Agreements containing arbitration clauses with Baird and, relying on advice from Baird advisors, acquired variable life insurance policies through AXA.  Id. at *1-2.  The suit alleged that the defendants knowingly made misrepresentations regarding the AXA policies.  Id. at *3.  The court ultimately found that AXA, a nonsignatory to the Cash Account Agreement, could nonetheless compel the plaintiffs to arbitrate their claims against it under a theory of equitable estoppel because the complaint raised "allegations of substantially interdependent and concerted misconduct by both Baird and AXA."  Id. at *33.  Thus, relying on Brown, the Court determined that concerted misconduct alone was sufficient to invoke equitable estoppel.  See id. at *30-33.

This District has also confronted the matter of equitable estoppel.  First, the Eastern District has found that equitable estoppel was appropriately applied where the "interdependent and concerted misconduct" element alone was met.  PFS Investments, Inc. v. Imhoff, No. 11-10142, 2011 U.S. Dist. LEXIS 31417, at *22 (E.D. Mich. March 25, 2011) (relying on Grigson, 210 F.3d at 527).  However, this opinion's conclusory decision relied exclusively on Grigson, containing no discussion of other case law.

11

Other decisions within the Eastern District regarding equitable estoppel have found both that the nonsignatory being compelled to arbitrate has a close relationship with one of the signatories and that the claims raised by the plaintiffs are related to the agreement containing an arbitration clause.  See, e.g., Thomas v. Right Choice Staffing Group, LLC, No. 15-10055, 2015 U.S. Dist. LEXIS 87073, at *18-19 (E.D. Mich. July 6, 2015); Southerland v. Corp. Transit of Am., No. 13-14462, 2014 U.S. Dist. LEXIS 138117, at *5 (E.D. Mich. Sept. 20, 2014).

Federal courts have recognized that equitable estoppel "encompasses more than one test for its application."  PRM Energy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 834 (8th Cir. 2010) (citing CD Partners, LLC v. Grizzle, 424 F.3d 795, 798-99 (8th Cir. 2005)).  In applying equitable estoppel where the claims allege concerted misconduct or collusive behavior, the trend has been toward requiring that the claims also closely relate to and are intertwined with the agreement containing the arbitration clause.  See Driskill, 60 Ala. L. Rev. at 463.  This Court agrees that requiring that the allegations regarding collusive conduct bear some relation to the agreement at issue is the better policy.  Holding otherwise would sweep too broadly, as it would open the door to compelling arbitration of a claim based on *any* conspiracy, so long as one of the alleged co-conspirators had executed a contract containing an arbitration clause with the plaintiff.  Indeed, the purpose of the equitable estoppel doctrine "is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from 'relying on the contract when it works to [his] advantage [by establishing the claim], and repudiating it when it works to [his] disadvantage [by requiring arbitration].'"  In re Humana, 285 F.3d at 976 (quoting Tepper Realty Co. v. Mosaic Tile Co., 259 F. Supp. 688, 692 (S.D.N.Y. 1966)).

When there is no dependence on or relation to the contract, this purpose is effectively meaningless, as "the plaintiff is [not] trying to have cake in the first place." Driskill, 60 Ala. L. Rev. at 466.

### 2. Liability for DPPs' Purchases From Bosch

Having concluded that defendants must fulfill both prongs of the MS Dealer test, the Court must next determine whether the present case fulfills these prongs. The Court first turns to claims premised on DENSO's joint and several liability for purchases made from Bosch. It is undisputed that the claims levied against DENSO allege substantially interdependent or concerted misconduct between DENSO and Bosch. However, the parties disagree on whether the claims rely on or are intertwined with the underlying contracts – that is, the Bosch sales invoices. DENSO argues that in alleging a conspiracy to inflate prices artificially, DPPs inherently rely on the terms of the Bosch sales invoices containing those allegedly inflated prices. DPPs, in turn, contend that the claims exist wholly independently of the Bosch sales agreements because they would be unaffected if the agreements were held to be unenforceable.

The estoppel inquiry is fact-specific, and no court has definitively specified "the minimum quantum of 'intertwined-ness' required to support a finding of estoppel." JLM Indus., Inc. v. Stolt-Nielsen, SA, 387 F.3d 163, 178 (2d Cir. 2004). According to MS Dealer, a signatory's claims "arise out of" and "relate directly to a written agreement," when a claim "makes reference to" or "presumes the existence of" the written agreement. 177 F.3d at 947. Discussing the related inquiry of whether the scope of an arbitration clause encompasses a given action, practitioners have observed,

> Presumably, most price-fixing claims by a customer against a supplier will more likely be sufficiently related to whatever contract exists between the

13

> parties so as to allow referral of the dispute to arbitration. Price-fixing
> disputes brought by consumers who have executed form agreements are
> also likely to be found to be "related" to the subject of the agreements.

Thomas Campbell, Roxane Busey & Peter Koch, *Arbitrating Antitrust Claims – The
Road Less Traveled*, 19 Antitrust ABA 8, *9 (Fall 2004). This article compiles examples
of cases in which courts have determined that signatories' claims against nonsignatory
defendants depend in some manner on an underlying agreement containing an
arbitration clause. Id. at n.33.

One of those cases, which has been cited and discussed at length by DENSO,
involved a putative class action brought by a group of corporations in the business of
shipping and trading against owners of parcel tankers (the "Owners"). JLM Indus., 387
F.3d at 167. The putative class members had all executed contracts containing an
arbitration clause with the Owners in order to lease space on the tankers. Id. JLM, on
behalf of all prospective plaintiffs, alleged that the Owners dominated a combined two-
thirds of the international parcel tanker industry and that they exploited this market
power to conspire to fix prices. Id. One of the questions on appeal was whether the
scope of the arbitration agreement encompassed the antitrust price-fixing claims. Id. at
175. The Second Circuit found that the dispute arose out of the contract containing the
arbitration agreement, stating that the "Sherman Act claims unquestionably involve a
core issue of the contracts between the parties-allegations that the price terms set forth
in those contracts have been artificially inflated as a result of the price-fixing conspiracy
among the Owners." Id. at 176. The court reasoned that,

> JLM asserts that it suffered damages as a result of this conspiracy, and it
> could not have suffered these damages if it had not entered into the
> "nearly 80" contracts with the Owners . . . . That is, the damages which
> JLM asserts it suffered as a result of the conspiracy among the Owners

14

> result from the fact that it entered into the charters, each of which specifies price terms which are variously characterized in the amended complaint as "artificially high" and as "overpayments."

Id. at 175.

This reasoning is supported by the Eleventh Circuit's attempt to distinguish In re Humana from MS Dealer on the ground that the In re Humana plaintiffs made "no suggestion that the contracts containing arbitration clauses are themselves the product of, or in any way related to, the [defendants'] conspiratorial behavior." 285 F.3d at 976. In the present case, as in MS Dealer, DPPs allege that the prices reflected in the Bosch sales invoices, which incorporate by reference an arbitration clause, are the product of the Defendants' price-fixing conspiracy. DPPs argue that their claims are entirely independent from the Bosch sales invoices because they would lie whether those agreements existed or not. The Court disagrees. Absent these Bosch sales invoices, DPPs would have suffered no damages related to purchases made from Bosch. Consequently, DPPs' claims are dependent on and intertwined with the Bosch sales invoices in a fundamental way. DPPs' argument that neither the Bosch sales invoices nor the DENSO distributor agreements contain price terms is puzzling, as a review of those documents reflects that they do contain unit prices and net price amounts. (See Case No. 16-13506, Doc. 7, Exs. 2, 3, 6). Further, to require that the claims brought against a nonsignatory involve the interpretation, construction, or enforcement of an underlying contract would imply that the application of equitable estoppel to compel arbitration is only appropriate in cases that concern breach of contract claims. See JLM, 387 F.3d at 176.

DPPs rely on contrary case law decided by the Eighth Circuit, in which five retail grocers (the "Retailers") brought antitrust conspiracy claims against one of two wholesale grocers (the "Wholesalers").   In re Wholesale Grocery Prods. Antitrust Litig., 707 F.3d 917, 919 (8th Cir. 2013).  Each individual Retailer was a customer of and had an arbitration agreement with only one of the Wholesalers but brought suit against the Wholesaler with which it did *not* conduct business.  Id.  The issue on appeal was whether the nonsignatory Wholesalers could compel the Retailers to arbitrate pursuant to equitable estoppel.  Id. at 921.  In evaluating whether the claims relied upon were sufficiently intertwined with the underlying agreement, the Eighth Circuit stated that "merely alleging that a non-signatory conspired with a signatory is insufficient to invoke equitable estoppel, absent some 'intimate[] . . . and intertwined relationship between the claims and the agreement containing the arbitration clause."  Id. at 923 (quoting PRM Energy, 592 F.3d at 835).  The court ultimately determined that equitable estoppel did not apply because the Retailers' antitrust conspiracy claims existed independently of the agreements with the Wholesalers, as they did not arise directly from violations of the terms of the contracts.  Id.  Additionally, the court reasoned that although the Retailers' antitrust claims were premised on paying artificially inflated prices, none of the contracts with the Wholesalers specified price terms.  Id. at 924.

As an initial matter, this Court observes that whereas the contracts at issue in In re Wholesale Grocery did not contain price terms, the Bosch sales invoices did incorporate such terms.  The Court also finds In re Wholesale Grocery at odds with the principle adopted in the Sixth Circuit that a plaintiff may not evade arbitration through artful pleading.  See Arnold v. Arnold Corp., 920 F.2d 1269, 1281 (6th Cir. 1990) ("We

agree with the district court that if appellant 'can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified.'"). Here, in apparent acknowledgement of the Bosch and DENSO arbitration agreements, DPPs have dismissed their claims against Bosch entirely and have amended their complaint to dismiss their claims against DENSO for damages resulting from purchases made directly from DENSO. DPPs currently pursue claims against DENSO based only on its joint or several liability for purchases made from its alleged co-conspirators Bosch and NGK. Nonetheless, they continue to pursue claims against NGK based on its joint and several liability for purchases made from DENSO. This tactical behavior is, in the Court's eyes, a clear effort on the part of the DPPs to gerrymander their complaints in order to avoid arbitration.

Finally, DPPs cite to Murphy v. DirecTV, Inc., 724 F.3d 1218 (9th Cir. 2013). In that case, a putative class brought suit against DirecTV and Best Buy, alleging that the two defendants misrepresented certain DirecTV service equipment as though they were for sale at Best Buy when in fact the defendants considered the transaction to be a lease. Id. at 1223. Best Buy sought to compel arbitration pursuant to equitable estoppel based on an arbitration clause included in DirecTV's Customer Agreement. Id. at 1230. The Ninth Circuit held that equitable estoppel was inapplicable because the plaintiffs' claims were not intertwined with the substance of the Customer Agreement. This Agreement merely provided that "if a customer is leasing his DirecTV equipment, it is non-transferable and must be returned upon cancellation." Id. (emphasis in original).

17

Accordingly, the court held that the Customer Agreement was factually irrelevant to the plaintiffs' allegations of deceit against Best Buy; rather, the deceit alleged was reflected in Best Buy's representations surrounding the sale.  Id.  In the present case, in contrast, the deceit or conspiracy alleged is reflected in the price terms of the various sales agreements.  That is, each of the conspiring defendants is alleged to have had a hand in artificially inflating the price terms included in the other conspiring defendants' sales invoices.  In light of the above discussion, the Court holds that application of the doctrine of equitable estoppel is proper in order to compel the arbitration of DPP's claims against DENSO arising from the damages attributable to Bosch's sales.

### 3.  Liability for DPPs' Purchases From NGK

It is undisputed that NGK did not execute direct arbitration agreements with the DPPs.  Nonetheless, DENSO requests that the Court dismiss in favor of arbitration the claims premised on its joint and several liability for purchases made from NGK. Alternatively, DENSO requests that the Court stay these claims pending arbitration of the other claims made against DENSO.  DENSO reasons that because all claims derive from the same alleged conspiracy, arbitration of any claims would necessarily confront and resolve matters pertinent to damages resulting from NGK's sales.

DENSO relies on several cases acknowledging the judicial preference favoring arbitration and noting that the "policy in favor of this expeditious alternative to the judicial system is thwarted if all disputed issues in an arbitration proceeding must be segregated into arbitrable and nonarbitrable categories."  See Cole v. FES, LLC, No. 10-12041, 2010 U.S. Dist. LEXIS 94701, at *10 (E.D. Mich. Sept. 13, 2010); Rooyakker & Sitz, LLC v. Plante & Moran, PLLC, 742 N.W.2d 409, 421 (Mich. Ct. App. 2007);

Detroit Auto. Inter-Ins. Exch. v. Reck, 282 N.W.2d 292, 294 (Mich. Ct. App. 1979).

However, as quoted above, "arbitration is a matter of contract and a party cannot be

required to submit to arbitration any dispute which he has not agreed so to submit."

AT&T Techs., 475 U.S. at 648.  With respect to joint and several liability for damages

stemming from purchases made from NGK, there is no contract containing an

arbitration clause to enforce.  DENSO is effectively a nonsignatory to a nonexistent

arbitration agreement.  None of the case law cited by DENSO compelled arbitration

under such circumstances, and the Court declines to do so now.

However, the FAA permits piecemeal, concurrent litigation where only some

issues are arbitrable.  Thomas, 2015 U.S. Dist. LEXIS 87073 at *20 (citing Dean Witter

Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985)).  The Supreme Court has determined

that, "[i]n some cases . . . it may be advisable to stay litigation among the nonarbitrating

parties pending the outcome of the arbitration.  That decision is one left to the district

court . . . as a matter of its discretion to control its docket."  Id. at *21 (quoting Moses H.

Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 n.23 (1983)) (internal

quotations omitted) (citing cases).  This District has cited to several opinions decided by

courts within the Sixth Circuit premised on the notion that a "court should stay litigation

of non-arbitrable claims 'where a decision in one forum could affect the resolution of

claims in the other.'"  Id. (quoting Spartech CMD, LLC v. Int'l Auto. Components Grp.,

N.A., No. 08-13234, 2009 U.S. Dist. LEXIS 13662, at *13 (E.D. Mich. Feb. 23, 2009)).

See also DRS Precision Echo, Inc. v. Michigan Magnetics, Inc., No. 1:02-cv-161, 2003

U.S. Dist. LEXIS 3851, at *5 (W.D. Mich. Jan. 7, 2003) ("In a situation like the present

case, where some claims are non-arbitrable, they can simultaneously proceed in this

Court only *if* they can be separated out; in other words, *if their resolution has no effect on the arbitrable issues.*").

Given the basis of the claims – an alleged conspiracy amongst DENSO, Bosch, and NGK to fix prices – a decision regarding purchases made from one alleged co-conspirator will necessarily implicate the merits of claims relating to purchases made from another alleged co-conspirator.  That is, an arbitrator determining DENSO's joint and several liability for DPPs' purchases made from Bosch would be forced to confront the merits of the alleged price-fixing conspiracy amongst DENSO, Bosch, and NGK.  This issue is clearly central to a determination of DENSO's liability for purchases made from NGK.  All claims depend on a common core of facts and are inherently inseparable.  Accordingly, a stay of the non-arbitrable proceedings against DENSO relating to DPPs' purchases from NGK is appropriate.

**B. Claims Asserted Against NGK**

Next, the Court confronts NGK's motion to dismiss or stay the claims asserted against it.  As discussed above, purchase orders executed with NGK did not incorporate an arbitration agreement.  The named DPPs bringing suit against NGK with respect to Spark Plugs are WAL, Inc. d/b/a Tri-State Automotive Warehouse ("Tri-State"); KMG/CT Inc. d/b/a KMG Warehouse Distributors, Inc. ("KMG"); and Dyke, Inc. ("Dyke").  The named DPPs bringing suit against NGK with respect to Oxygen Sensors are Tri-State and KMG.  Both Tri-State and KMG purchased Spark Plugs and Oxygen Sensors not only from NGK but also from Bosch and DENSO.  Therefore, they signed the arbitration agreements with DENSO and Bosch.  However, because Dyke made purchases of Spark Plugs only from NGK, it never executed an arbitration agreement.

### 1. Liability for DPPs' Purchases From Bosch

Though NGK does not separate discussion of the claims levied against it based on the origin of the purchase, the Court finds that this mode of analysis is the most logical. With respect to NGK's joint and several liability for the injuries alleged to have been incurred by DPPs through purchases made from Bosch, NGK may compel arbitration based on the clause incorporated in the Bosch sales invoices. Equitable estoppel applies for the same reasons articulated in the discussion above regarding DENSO's enforcement of the Bosch arbitration agreement.

First, any DPP alleged to have suffered damages resulting from purchases made from Bosch would have agreed to the arbitration clause incorporated by reference into the sales invoices. Second, as discussed above with respect to the claims asserted against DENSO, DPPs' claims against NGK allege both collusive behavior amongst the Defendants and assert claims that are "intimately founded in and intertwined with the obligations imposed by" the Bosch sales invoices. See In re Humana, 285 F.3d at 975. Accordingly, equitable estoppel appropriately requires arbitration of these claims.

### 2. Liability for DPPs' Purchases From DENSO

Next, the Court finds that arbitration is proper with respect to DPPs' claims against NGK based on its joint and several liability for damages resulting from purchases made from DENSO. Any DPP alleged to have suffered damages through purchases made from DENSO would have agreed to the arbitration clause contained in DENSO's distributor agreement. Indeed, both Tri-State and KMG executed agreements containing arbitration clauses. (Case No. 16-13506, Doc. 7, Exs. 4, 5). Whereas Bosch's sales invoices designated Michigan law as controlling, DENSO's distributor

agreements designate California law as controlling.  According to California law, equitable estoppel applies in one of two circumstances.  First, it applies "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory."  Goldman v. KPMG, LLP, 92 Cal. Rptr. 3d 534, 541 (Cal. Ct. App. 2009).  Second, it applies when the claims are premised on allegations of interdependent and concerted misconduct and that misconduct is "founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause."  Id.  In substance, California law thus requires that both prongs of the MS Dealer test be satisfied in order for equitable estoppel to apply.

Because the Court concluded above that both elements must be met with respect to whether nonsignatory DENSO could enforce Bosch's arbitration clause, that discussion is equally relevant here.  First, it is undisputed that DPPs' claims are premised on allegations of concerted misconduct.  Second, for the reasons articulated in the above discussion regarding the claims against DENSO, that alleged misconduct is inextricably bound up with the obligations imposed by DENSO's underlying distributor agreements.  Accordingly, arbitration of these claims is proper.

### 3.  Liability for DPPs' Purchases Directly From NGK

Finally, the Court confronts the matter of compelling arbitration of NGK's liability for its own direct sales.  The Court emphasizes again that NGK did not execute its own arbitration agreement with its purchasers.  Though named DPPs Tri-State and KMG are subject to arbitration of their claims against NGK based on purchases made from Bosch and DENSO, named DPP Dyke asserts claims against NGK only.  Because Dyke made

22

purchases exclusively from NGK, it has executed no arbitration agreement whatsoever.

In light of the above conclusion declining to enforce arbitration regarding DENSO's joint and several liability based on NGK's sales, the Court also declines to enforce arbitration regarding NGK's direct liability for its own sales. There is no arbitration agreement between NGK and any of the DPPs, and the Court does not find it appropriate to require arbitration simply because it has found that claims regarding purchases made from Bosch and DENSO must be arbitrated. This conclusion is particularly salient with respect to named DPP Dyke, which did not agree to arbitrate claims related to any of its purchases. See Driskill, 60 Ala. L. Rev. at 461 (quoting Jose de la Fuente, *Developments in Substantive Law: Alternative Dispute Resolution "Arbitration Tango,"* Tex. Law. Dec. 19, 2005, at 38 ("[E]ven parties who are careful to avoid any written entanglement with a contract subject to arbitration must exercise care to avoid acting in a way that might subject them to arbitration despite their wishes.").

NGK maintains that Dyke is compelled to arbitrate because equitable estoppel permits enforcement of arbitration agreements not only *by* nonparties but also *against* nonparties. NGK cites to Sixth Circuit case law stating that "a nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a *direct* benefit from the contract while disavowing the arbitration provision." Javich, 315 F.3d at 629. According to NGK, Dyke seeks a direct benefit from the DENSO and Bosch purchase agreements because its price-fixing allegations depend on these Defendants' coordinated misconduct with respect to the prices stated in these agreements. However, Javich did not resolve whether equitable estoppel applied under

the circumstances of that case. Id. Even if it had, the facts of Javich involved a nonsignatory who was appointed the signatory's receiver and therefore stood in the shoes of the signatory. Id. at 625. Here, in contrast, a nonsignatory is attempting to enforce an arbitration agreement against another nonsignatory. Accordingly, because no authority supports compelling arbitration between two entities that are nonparties to an arbitration agreement, the Court declines to dismiss the claims asserted against NGK arising from its own sales.

NGK alternatively requests that the Court stay the claims asserted against it pending outcome of arbitration. "A stay is appropriate where the remaining claims depend upon the same facts and are inherently inseparable from arbitrable claims, arbitration may resolve issues in the lawsuit, or where staying litigation would promote the federal policy in favor of arbitration." Harajli v. Bank of Am., N.A., No. 14-CV-12173, 2014 U.S Dist. LEXIS 140089, at *4 (E.D. Mich. Oct. 2, 2014) (citing Gordon v. Royal Palm Real Estate Inv. Fund I, LLLP, No. 09-11770, 2011 U.S. Dist. LEXIS 22911, at *8 (E.D. Mich. March 8, 2011). As discussed above, resolution of the arbitrable matters would implicate the facts underlying DPPs' claims against NGK. Accordingly, a stay is warranted.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** DENSO's motion –the claims brought against DENSO based on purchases made from Bosch are hereby **DISMISSED**, and the claims brought against DENSO based on purchases made from NGK are hereby **STAYED**. The Court also **GRANTS** NGK's motion – the claims brought against NGK based on purchases made from Bosch or DENSO are hereby **DISMISSED**, and the

24

claims brought against NGK based on purchases made directly from NGK are hereby

**STAYED**.

**IT IS SO ORDERED.**

Date:        April 18, 2017                              s/Marianne O. Battani
                                                        MARIANNE O. BATTANI
                                                        United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on April 18, 2017.

                                                        s/ Kay Doaks
                                                        Case Manager